471 F.3d 111
 William Woodrow WILSON, Petitioner-Appellee-Cross-Appellant,
v.
Alberto GONZALES,* Attorney General of the United States; Doris Meissner, Commissioner, Immigration and Naturalization Service; Edward McElroy, New York District Director, Immigration and Naturalization Service; Lynne Underdown, New Orleans District Director, Immigration and Naturalization Service; Immigration and Naturalization Service, United States Department of Justice, Respondents-Appellants-Cross-Appellees.
 Docket No. 04-5869-PR(L).
 Docket No. 04-5973-(XAP).
 United States Court of Appeals, Second Circuit.
 Argued November 21, 2005.
 Decided December 7, 2006.
 
 Matthew L. Guadagno, New York, N.Y. (Ruchi Thaker, Kerry W. Bretz, Jules E. Coven, Chungmi Michelle Hua, on the brief, and Bretz & Coven, LLP, of counsel), for Petitioner-Appellee-Cross-Appellant.
 Andrew M. McNeela, Assistant United States Attorney, New York, NY, (Michael J. Garcia, United States Attorney for the Southern District of New York, Kathy S. Marks, Assistant United States Attorney, of counsel), for Respondents-Appellants-Cross-Appellees.
 Lee Gelernt, American Civil Liberties Union Foundation, Immigrants' Rights Project, New York, N.Y. (Omar C. Jadwat, New York, NY; Lucas Guttentag and Jennifer C. Chang, Oakland, CA; and Trina A. Realmuto and Mary Kenney, American Immigration Law Foundation, Washington, DC, of counsel), for American Immigration Law Foundation and the American Civil Liberties Union Foundation as Amici Curiae in support of Petitioner.
 Before: JACOBS, Chief Judge, OAKES and WALKER, Senior Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 The United States appeals and Petitioner-Appellee-Cross-Appellant William Woodrow Wilson ("Wilson") cross-appeals from a November 17, 2004, judgment of the United States District Court for the Southern District of New York (Wood, J.), granting habeas relief to Wilson and remanding the case to the Bureau of Immigration Appeals ("BIA") for further consideration regarding Wilson's eligibility for relief under the repealed § 212(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(c).
 
 
 2
 For the reasons stated below, Wilson is required to make an individualized showing that he decided to forgo the opportunity to affirmatively file for § 212(c) relief in reliance on his ability to file for such relief at a later date. Therefore, the case is remanded to the BIA for further remand so that relevant findings of fact on the issue of such individualized reliance can be made. However, Wilson's cross-appeal regarding the district court's ruling on his eligibility to apply for naturalization is dismissed for failure to exhaust his administrative remedies.
 
 I. Background
 A. Wilson's Relevant History
 
 3
 On November 5, 1967, at four years old, Wilson, a native and citizen of Jamaica, was admitted into the United States as a lawful permanent resident. As a young man, in New York State Supreme Court, Queens County, on October 21, 1986, Wilson was convicted by a jury of robbery in the second degree and criminal possession of stolen property in the third degree. On November 12, 1986, he was sentenced to concurrent prison terms of two to six years for the robbery count and one year for the possession count. Wilson served twenty-seven months' imprisonment. The parties agree that, under applicable law at the time of these convictions, neither crime was considered an aggravated felony; therefore, Wilson was not considered deportable.
 
 
 4
 On February 13, 1987, also in New York State Supreme Court, Queens County, Wilson pleaded guilty to assault in the first degree. Neither Wilson nor the Government elaborates on the underlying facts of this crime. For the assault conviction, Wilson was sentenced to a term of twenty-eight months' to seven years' imprisonment. The term ran concurrently with the sentence Wilson was already serving.
 
 
 5
 The record also reveals that, subsequently, on April 15, 1993, Wilson was convicted of criminal possession of a weapon. The Government merely mentions this conviction in a footnote, whereby Wilson admitted to the conviction during the course of his removal hearing.
 
 
 6
 In the fall of 1997, Wilson traveled from the United States to Jamaica for a "brief vacation."[1] On October 31, 1997, Wilson returned to the United States. On arrival at the John F. Kennedy Airport in New York City, Wilson presented himself for inspection as a returning lawful permanent resident. An immigration inspector determined that Wilson was inadmissible because of his "lengthy criminal record." Wilson was, therefore, taken into custody and was temporarily detained without bond at 201 Varick Street, New York, New York.
 
 B. The Removal Proceedings
 1. In the Immigration Court
 
 7
 On November 1, 1997, the INS served Wilson with a Notice to Appear. The Notice alleged that Wilson was inadmissible pursuant to (1) INA § 212(a)(2)(A)(i)(I) (codified in 8 U.S.C. § 1182(a)(2)(A)(i)(I) (Supp. II 1996)), because Wilson had been convicted of a crime involving moral turpitude; and (2) INA § 212(a)(2)(B) (codified in 8 U.S.C. § 1182(a)(2)(B) (Supp. II 1996)), because Wilson had been convicted of two or more criminal offenses for which the aggregate sentences of confinement exceeded five years, regardless of whether the offenses involved moral turpitude.
 
 
 8
 On November 6, 1997, in New York, an immigration judge ("IJ") held a bond hearing for Wilson. The IJ indicated that he did not believe Wilson was eligible for bond based on his classification as an arriving alien, and Wilson withdrew his bond request.
 
 
 9
 On December 2, 1997,[2] Wilson was transferred to Federal Detention Center ("FDC") Oakdale in Louisiana. Thereafter, on December 9, 1997, the INS filed a Notice to Appear with the Immigration Court in Oakdale.
 
 
 10
 On December 10, 1997, Wilson filed a motion seeking to be reclassified as an "Admitted Alien." In his motion, Wilson argued that his departure from the United States was "brief, casual, and innocent," and that, in keeping with the Supreme Court's decision in Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), Wilson should not be classified as an Arriving Alien. The Oakdale IJ denied Wilson's motion on January 14, 1998. The IJ reasoned that INA § 101(a)(13)(C) (codified in 8 U.S.C. § 1101(a)(13)(C) (Supp. II 1996)), had been amended to provide that a legal permanent resident is regarded as seeking admission if he has committed certain criminal offenses, including crimes of moral turpitude.
 
 
 11
 On January 26, 1998, Wilson's removal hearing was resumed before the Oakdale IJ. At this hearing, Wilson admitted that he was a native and citizen of Jamaica; that he had been convicted on November 12, 1986, of robbery and criminal possession of stolen property; and that on February 13, 1987, he had been convicted of assault.
 
 
 12
 The removal hearing was again resumed on February 26, 1998. At this hearing, the IJ entered Wilson's criminal conviction records into evidence without objection and found that Wilson was removable as charged. In addition, the IJ found that Wilson had not acquired derivative citizenship based on his parents' naturalization because his father had not been naturalized prior to Wilson's eighteenth birthday.
 
 
 13
 In response, Wilson sought a waiver of deportation pursuant to former INA § 212(c) (hereinafter, "§ 212(c)"). Wilson argued that, although § 212(c) had been repealed prior to the commencement of his removal proceedings, he remained eligible for § 212(c) relief because his criminal convictions predated the enactment of both the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, 1277 (Apr. 24, 1996), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208, § 304(b), 110 Stat. 3009-546, 597 (Sept. 30, 1996). The IJ rejected Wilson's argument, ruling that § 212(c) was unavailable to aliens whose deportation proceedings had commenced after § 212(c) was repealed.
 
 
 14
 In addition, the IJ denied Wilson's request to terminate the deportation proceedings in order to allow Wilson to apply for naturalization. The IJ reasoned that he lacked the authority to terminate the proceedings because neither the INS nor the naturalization court had indicated that Wilson was eligible for naturalization. On February 26, 1998, the IJ issued an oral decision finding Wilson removable as charged and ineligible for any relief.
 
 2. Before the BIA
 
 15
 On March 13, 1998, Wilson timely appealed the IJ's decision to the BIA. Wilson argued that the IJ erred in applying IIRIRA retroactively to his September 30, 1996, conviction and that the IIRIRA is unconstitutional, violating the Due Process Clause of the Fifth Amendment and international law. Wilson asserted that IIRIRA was impermissively retroactive because its application to pre-IIRIRA convictions attached new legal consequences to past conduct.
 
 
 16
 The BIA dismissed Wilson's appeal on August 28, 1998, affirming the IJ's determination that Wilson was removable as charged. The BIA agreed with the IJ that Wilson was not eligible for § 212(c) relief because he had been placed in removal proceedings after the repeal of § 212(c).
 
 
 17
 In addition, the BIA concluded that robbery and assault constituted aggravated felonies as defined by INA § 101(a)(43)(F), 8 U.S.C. § 1101(a)(43)(F) (pertaining to crimes of violence), as amended by § 321 of IIRIRA. Accordingly, the BIA found that Wilson was not eligible for cancellation of removal under INA § 240A, 8 U.S.C. § 1229b, or a waiver of removal under INA § 212(h), 8 U.S.C. § 1182(h).
 
 3. In the District Court
 
 18
 On September 28, 1998, Wilson filed a petition for a writ of habeas corpus in the Southern District of New York. At the time, Wilson was detained at FDC Oakdale in Louisiana. Wilson argued, first, that IIRIRA's repeal of § 212(c) was impermissibly retroactive as applied to him because his convictions predated IIRIRA's enactment. Second, Wilson reasserted his argument that IIRIRA's repeal of § 212(c) violates his equal protection rights under the Due Process Clause of the Fifth Amendment. Third, Wilson argued again that the INS had impermissibly refused to terminate Wilson's proceedings in order to allow Wilson to apply for naturalization.
 
 
 19
 On May 19, 2003, the magistrate judge to whom the case was assigned recommended that Wilson's habeas petition be denied on the merits. Analyzing the jurisdictional issues in the case, the magistrate judge ruled that jurisdiction in the Southern District of New York was proper, in part because, although Wilson's removal hearings took place in Louisiana, Wilson had been detained in New York, had resided in New York, and had served his term of imprisonment in New York.
 
 
 20
 On September 3, 2004, the district court granted Wilson's habeas petition in part, finding that Wilson was eligible for § 212(c) relief pursuant to this Court's decision in Restrepo v. McElroy, 369 F.3d 627 (2d Cir.2004). The district court adopted the approach propounded by the concurring opinion in Restrepo, applying a categorical approach to determining whether § 212(c) relief is available to an alien with a pre-AEDPA trial conviction.
 
 
 21
 However, the district court rejected Wilson's claim that he was eligible to apply for naturalization. The court noted that Wilson needed to establish that he was an alien of "good moral character" and that Wilson would not be able to make such a showing with two aggravated felony convictions on his record.
 
 
 22
 Ultimately, the district court granted Wilson's petition in part and remanded the matter to the BIA to determine whether Wilson would be eligible for discretionary relief pursuant to § 212(c). The Government appealed the district court judgment, and Wilson cross-appealed.[3]
 
 
 23
 C. Relevant Developments During the Pendency of this Appeal and a Brief Discussion Thereof
 
 
 24
 During the time this appeal was pending in this Court, Congress passed the REAL ID Act of 2005 ("REAL ID Act," "REAL ID," or "Act"), Pub.L. No. 109-13, 119 Stat. 231, 302, which significantly affected the procedure for disposing of a habeas petition that, like Wilson's, challenged a final order of removal. The enactment of the REAL ID Act raised two threshold issues we must first address: a procedural issue and a jurisdictional issue (with a related venue issue). Thus, the Court must consider whether an alien's habeas petition challenging a final order of removal and pending in this Court during the enactment of the Act should be converted to a petition for review brought under 8 U.S.C. § 1252. Second, we must address the issue of whether the REAL ID Act requires this Court to transfer the case to the Fifth Circuit, in which Wilson's immigration proceedings took place.
 
 
 25
 Both of these threshold issues have been resolved by recent opinions of this Court. As to the treatment of Wilson's habeas petition challenging the final order of removal: Pursuant to § 106(c) of the Act, and following the ruling in Gittens v. Menifee, 428 F.3d 382 (2d Cir.2005)(per curiam), the appeal is converted to a petition for review brought under 8 U.S.C. § 1252. As to this Court's jurisdiction: Despite the Government's contention that the case should be transferred to the Fifth Circuit pursuant to INA § 242(b)(2), based on this Court's recent ruling in Moreno-Bravo v. Gonzales, 463 F.3d 253 (2d Cir.2006), and for the reasons articulated therein, we retain jurisdiction over the appeal.
 
 
 26
 Regarding the Government's supplemental venue argument, i.e., "that even if INA § 242(b)(2) were not jurisdictional it is nonetheless a mandatory venue provision which cannot be ignored absent a waiver," Gov't's Rule 28(j) Letter (Sept. 19, 2006) at 1 (citing Moreno-Bravo, 463 F.3d at 260-63), the Court is unpersuaded. We take a moment to articulate our reading more thoroughly. Contrary to the Government's implication, we are not ignoring venue. However, much like the scenario of Moreno-Bravo, we are faced with a case in "procedural limbo," Amunikoro v. Sec'y of Dep't of Homeland Sec., 432 F.3d 383, 385 (2d Cir.2005), and find "we are in somewhat uncharted [sic] waters, as we, unaided by express instructions from Congress or the REAL ID Act, attempt to impose order on these sui generis appeals." Moreno-Bravo, 463 F.3d at 263. In Amunikoro, we reasoned that venue "`is a concept of convenience.'" 432 F.3d at 386 (quoting Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs, 307 F.2d 21, 29 (2d Cir.1962)); see also id. at 386 ("[I]t is well-settled that `[v]enue requirements are normally for the convenience of the parties and, if the parties do not object, there is no policy objection to proceeding in any court with jurisdiction.") (quoting Georcely v. Ashcroft, 375 F.3d 45, 49 (1st Cir.2004)).
 
 
 27
 Here, the Government has objected to venue in this Court. However, given the protracted procedural history of this case, we believe retaining venue in this Court is proper. While it is true that Wilson's removal proceedings were conducted in Louisiana, within the Fifth Circuit, he filed his habeas petition in the Southern District of New York, within the Second Circuit. Moreover, not only has appeal been filed in this Court, but it has progressed to such a point that to transfer the appeal to the Fifth Circuit for the appeal process to begin anew, in and of itself, would be inconvenient. Thus, for much the same reasons as we stated in Moreno-Bravo, i.e., having already had one round of judicial review by the district court ("albeit one that has been rendered a nullity by REAL ID") and having had the case thoroughly briefed and argued before this Court, "it would be a manifest injustice to now transfer this case to another court for duplicative proceedings." 463 F.3d at 263 (citing Jama v. Gonzales, 431 F.3d 230, 233 (5th Cir.2005)). In sum, given the advanced state of this case (in terms of its appellate review), together with the fact that INA § 242(b)(2) did not provide any guidelines for cases in the relatively unique procedural posture presented here, we believe this Court is as appropriate (if not more so) as is the Fifth Circuit to hear Wilson's petition for review.
 
 
 28
 * * * * * *
 
 
 29
 Thus, the remaining issues in this case concern (1) Wilson's eligibility for § 212(c) relief in light of INS v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); Rankine v. Reno, 319 F.3d 93 (2d Cir.2003); Restrepo v. McElroy, 369 F.3d 627 (2d Cir.2004); and, most recently, Fernandez-Vargas v. Gonzales, ___ U.S. ___, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006); and (2) Wilson's eligibility for naturalization pursuant to INA § 101(f)(8), 8 U.S.C. § 1101(f)(8).
 
 
 30
 The Government argues that an alien, like Wilson, who asserts that he is eligible for § 212(c) relief under this Court's decision in Restrepo, should be required to make an individualized showing of reliance; therefore, the matter should be remanded to the BIA to determine in the first instance whether Wilson can make such a showing, and, if so, whether he merits such relief as a matter of discretion.
 
 
 31
 Conversely, Wilson argues for a categorical approach to a petitioner's reliance on the availability of § 212(c) relief, contending that the Supreme Court and Second Circuit both generally apply a categorical approach in retroactivity analyses.
 
 
 32
 Also, in his cross-appeal, Wilson argues that he is entitled to § 212(c) relief because his jury convictions were for crimes that, at the time of conviction, were not considered crimes of moral turpitude, were not aggravated felonies, and did not make him deportable. Wilson contends, therefore, that the analysis, should center on his 1987 guilty plea, rather than on his earlier jury trial convictions.
 
 
 33
 For the reasons that follow, we are persuaded that a petitioner who asserts that he is eligible for § 212(c) relief under Restrepo, such as Wilson, is required to make an individualized showing of reliance. Further, because of his failure to raise his eligibility for naturalization argument to the BIA, and the Government's protestation of it being raised now, we will invoke our doctrine of issue exhaustion; therefore, we dismiss Wilson's cross-appeal. See Foster v. INS, 376 F.3d 75 (2d Cir. 2004) ("a failure to exhaust ... `constitutes a clear jurisdictional bar'" (quoting Mejia-Ruiz v. INS, 51 F.3d 358, 362 (2d Cir.1995))).
 
 
 34
 II. DISCUSSION Regarding Wilson's Attempt to Secure § 212(c) Relief
 
 
 35
 Section 212(c) of the INA provided discretionary relief from deportation for aliens who could demonstrate that (1) they had been admitted to the United States as lawful permanent residents; (2) they had resided in the United States for at least seven years; and (3) their convictions were not for aggravated felonies for which they had served terms of imprisonment of five years or longer. 8 U.S.C. § 1182(c)(repealed 1996). Because Wilson's 1986 and 1987 convictions were not considered aggravated crimes at those times, Wilson may have fit squarely within the category of aliens eligible for § 212(c) discretionary relief.
 
 
 36
 Yet, on April 24, 1996, through § 440(d) of AEDPA, Congress eliminated § 212(c) relief for certain criminal aliens, including those convicted of aggravated felonies, irrespective of the amount of time they served in prison. Soon thereafter, on September 30, 1996, § 304(b) of IIRIRA repealed § 212(c) relief in its entirety and replaced it with a form of relief called "cancellation of removal," which is unavailable to aggravated felons. See Thom v. Ashcroft, 369 F.3d 158, 159 (2d Cir.2004). Subsequent precedential case law development guides our analysis on the effects of AEDPA and IIRIRA to Wilson's claim of continued eligibility for § 212(c) relief. We briefly discuss that case law development now.
 
 
 37
 A. An Overview of Relevant Case Law Development
 
 1. The Supreme Court's Decision in St. Cyr
 
 38
 In 2001, in St. Cyr, the Supreme Court was asked to determine whether the retroactive effect of IIRIRA was permissible or not. Specifically, a lawful permanent United States resident, who, before the enactment of either the AEDPA or the IIIRA, had pled guilty to a criminal charge that made him deportable, sought the relief afforded by INA § 212(c) in his removal proceeding that was commenced after the enactment of AEDPA and IIRIRA. See St. Cyr, 533 U.S. at 289, 121 S.Ct. 2271. Both the district court and this Court had determined that § 212(c) relief was still available. In making its determination, this Court relied primarily on the Supreme Court's retroactivity analysis articulated in Landgraf v. USI Film Prods., 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and, applying that analysis, held the retroactive effect of IIRIRA was impermissible. See St. Cyr v. INS, 229 F.3d 406, 417-18 (2d Cir.2000). The Supreme Court agreed; thus, § 212(c) remained available to aliens in removal proceedings who entered guilty pleas prior to the enactment of IIRIRA. See St. Cyr, 533 U.S. at 315, 326, 121 S.Ct. 2271.
 
 
 39
 In finding that a retroactive application of IIRIRA would be contrary to "`familiar considerations of fair notice, reasonable reliance, and settled expectations,'" id. at 323, 121 S.Ct. 2271 (quoting Landgraf, 511 U.S. at 270, 114 S.Ct. 1483), the Supreme Court relied heavily on the fact that "[p]lea agreements involve a quid pro quo between a criminal defendant and the government," id. at 321, 114 S.Ct. 1483. By entering into a plea agreement, an alien-defendant surrenders important constitutional rights (such as a trial by jury) in anticipation of, inter alia, receiving a sentence that preserves his eligibility for § 212(c) relief (i.e., a sentence of less than five years), while the government receives the benefit of "`promptly imposed punishment without the expenditure of prosecutorial resources.'" Id. at 321-23, 114 S.Ct. 1483 (quoting Newton v. Rumery, 480 U.S. 386, 393 n. 3, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987)). The Supreme Court reasoned that an alien-defendant's reliance on the continued availability of § 212(c) relief was reasonable because, "as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions." Id. at 322, 114 S.Ct. 1483 (citing Magana-Pizano v. INS, 200 F.3d 603, 612 (9th Cir.1999)). Importantly, this conclusion was based on ample objective evidence: e.g., numerous state laws requiring trial judges to advise defendants that immigration consequences may result from their pleas, id. at 322, 114 S.Ct. 1483 n. 48; the fact that "numerous practice guides" advise defense counsel of the importance of preserving § 212(c) relief prior to entering into a plea agreement, id. at 323, 114 S.Ct. 1483 & n. 50; see also id. at 323, 114 S.Ct. 1483 (citing 3 Bender's Criminal Defense Techniques §§ 60A.01, 60A.02[02] (1999) ("Preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence."));[4] and an "instructive parallel litigation" in which the record expressly reflected that the alien-defendant's "sole purpose" for entering into a plea agreement was to ensure that "`he got less than five years to avoid what would have been a statutory bar on § 212(c) relief,'" id. at 323, 114 S.Ct. 1483 (quoting Jideonwo v. INS, 224 F.3d 692, 699 (7th Cir.2000)). Therefore, reasoning that aliens who pled guilty to deportable offenses "almost certainly relied" upon the likelihood of receiving § 212(c) relief in deciding to forgo their right to trial, the Supreme Court endorsed the categorical presumption that it would be unfair to apply the repeal of § 212(c) retroactively to this category of aliens. Id. at 325-26, 114 S.Ct. 1483; see also id. at 323, 114 S.Ct. 1483 (noting reliance upon "settled practice, the advice of counsel, and perhaps even assurances in open court").
 
 2. This Court's Decision in Rankine
 
 40
 St. Cyr's holding squarely addressed that class of aliens who had pled guilty to a crime that also rendered them deportable; sufficient evidence supported the conclusion that this class of aliens almost invariably relied reasonably on the continued eligibility of § 212(c) relief, entitling them to that relief even after its repeal by IIRIRA. However, St. Cyr did not answer whether "the fact that [alien-defendants] were convicted after trial dictate[s] a different conclusion on the retroactive effect of IIRIRA than that reached in St. Cyr, where the [alien-defendants] had pled guilty." Rankine, 319 F.3d at 98 (emphasis added). Rather, this Court provided the answer: a different conclusion is warranted. Thus, the Court rejected the petitioners' argument that IIRIRA's repeal of § 212(c) would be impermissibly retroactive as applied to them.
 
 
 41
 Noting the "strong signals" sent in St. Cyr "that aliens who chose to go to trial are in a different position with respect to IIRIRA than aliens like St. Cyr who chose to plead guilty," id. at 99, this Court grounded its determination on the two crucial differences between alien-defendants who plead and alien-defendants who choose to go to trial:
 
 
 42
 First, none of these petitioners detrimentally changed his position in reliance on continued eligibility for § 212(c) relief. Unlike aliens who entered pleas, the petitioners made no decision to abandon any rights and admit guilt— thereby immediately rendering themselves deportable—in reliance on the availability of the relief offered prior to IIRIRA. The petitioners decided instead to go to trial, a decision that, standing alone, had no impact on their immigration status....
 
 
 43
 Second, the petitioners have pointed to no conduct on their part that reflects an intention to preserve their eligibility for relief under § 212(c) by going to trial. If they had pled guilty, petitioners would have participated in the quid pro quo relationship, in which a greater expectation of relief is provided in exchange for forgoing a trial, that gave rise to the reliance interest emphasized by the Supreme Court in St.Cyr. As the Court made clear, it was that reliance, and the consequent change in immigration status, that produced the impermissible retroactive effect of IIRIRA. Here, petitioners neither did anything nor surrendered any rights that would give rise to a comparable reliance interest....
 
 
 44
 Id. at 99-100. Therefore, we held that "[b]ecause those aliens who went to trial prior to the elimination of § 212(c) relief cannot show that they altered their conduct in reliance on the availability of such relief," IIRIRA's repeal of § 212(c) has no impermissible retroactivity as applied to the Rankine petitioners. Id. at 100; see also id. at 102 ("[I]t cannot fairly be concluded that petitioners here relied on § 212(c) in the same way that aliens who chose to plead guilty did.").
 
 
 45
 3. This Court's Subsequent Decision in Restrepo
 
 
 46
 One year later, in Restrepo, this Court fine-tuned its St. Cyr-Rankine jurisprudence. In Restrepo, we held that under certain limited circumstances, an alien-defendant who was convicted pursuant to a jury trial prior to the enactment of AEDPA could still potentially be eligible for § 212(c) relief. Where Rankine "resolved the narrower question of whether an alien detrimentally relied on the continued availability of [§] 212(c) relief in deciding to go to trial rather than accepting a plea," Restrepo, 369 F.3d at 636, Restrepo's reliance claim was different. Though convicted of a deportable crime after trial, Restrepo argued that, nonetheless, he too detrimentally relied on the continued availability of § 212(c) relief in deciding to delay submitting his § 212(c) application so as to build a stronger case of rehabilitation upon which § 212(c) relief could be granted. See id. ("Petitioner incurred a heightened expectation of prospective relief flowing from [his] choice to forgo filing an affirmative application in the hope of building a stronger record and filing at a later date.")[5] Thus, we concluded:
 
 
 47
 [L]ike the aliens in St. Cyr, who sacrificed something of value—their right to a jury trial, at which they could obtain outright acquittal—in the expectation that their guilty pleas would leave them eligible for [§] 212(c) relief, an alien like [Restrepo] also sacrificed something— the shot at obtaining [§] 212(c) relief by immediately filing an application—in order to increase his chances of obtaining such relief later on.
 
 
 48
 Id. at 634-35 (footnote omitted). Significantly, we did not rule that a petitioner such as Restrepo was automatically entitled to § 212(c) relief; rather, the panel remanded the case to the district court to determine whether Restrepo could himself "claim the benefit of this argument." Id. at 639. The panel also directed the district court to determine whether a petitioner such as Restrepo needed to make an individualized showing of reliance or whether such a petitioner could reap the benefit of a categorical presumption of reliance. See id. Due to other factual revelations on remand, the district court never reached the issue of Restrepo's individualized reliance and deemed all other inquiries of this Court moot. See Restrepo v. McElroy, 354 F.Supp.2d 254, 255 (E.D.N.Y.2005).
 
 
 49
 4. The Supreme Court's Decision in Fernandez-Vargas
 
 
 50
 During the pendency of this appeal, the High Court again spoke on the issue of retroactivity with regard to IIRIRA. In Fernandez-Vargas v. Gonzales, ___ U.S. ___, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006), the Supreme Court addressed a new challenge to the retroactive effect of IIRIRA. Petitioner Fernandez-Vargas is a Mexican national who, after being deported several times in the 1970s, illegally reentered the United States in 1982. Since then, he started a trucking business, fathered a son (who is a U.S. Citizen), and remained undetected for approximately twenty years. See id. at 2427. That changed after Fernandez-Vargas's 2001 marriage to his son's U.S.-citizen mother. After the marriage, Fernandez-Vargas's wife filed an application to adjust her husband's status to that of lawful permanent resident. See id. Unfortunately for Fernandez-Vargas, this application drew attention to his illegal presence in the United States.
 
 
 51
 In 2003, the Government initiated proceedings under the new § 241(a)(5) and thereby reinstated Fernandez-Vargas's 1981 deportation order without eligibility to apply for adjustment of status. See id. at 2427. Fernandez-Vargas protested the application of the new law, arguing it would be impermissibly retroactive as applied to him; since his illegal reentry was before IIRIRA's effective date, i.e., April 1, 1997, he was entitled to the benefit of the terms of the former reinstatement provision under which he would have been allowed to apply for adjustment of status. See id.
 
 
 52
 The Supreme Court did not agree. Applying the retroactive framework it established in Landgraf, the Court first concluded that Congress had not expressly prescribed the statute's proper temporal reach, see id. at 2428-30. Therefore, it proceeded to the second step in the Landgraf analysis: considering whether the application of IIRIRA would have an impermissible retroactive effect. The Court concluded that there would be no such retroactive effect because it was not Fernandez-Vargas's illegal reentry that triggered application of the new law. Rather, it was his "choice to continue his illegal presence, after illegal reentry and after the effective date of the new law, that subject[ed] him to the new and less generous legal regime, not a past act that he is helpless to undo up to the moment the Government finds him out." Id. at 2432. In short, there was no "new disability consequent to a completed act." Id.
 
 
 53
 In its reasoning, the Court emphasized that it was not enough for the alien to profess his unilateral assumption about the continued validity of prior law. Notably, though, the Fernandez-Vargas Court suggested that a claim of proven reliance on pre-existing law might have produced a different result. Indeed, the Supreme Court stated that at step two of the Landgraf analysis, "we ask whether applying the statute to the person objecting would have a retroactive consequence ...." Id. at 2428. In addition, throughout the opinion, the Court repeatedly focused on the specific actions taken, or, as it were, not taken by Fernandez-Vargas in alleged reliance on prior law. See id. at 2431 n. 9 ("Although Fernandez-Vargas argues that he is being denied the chance to seek these forms of relief, he never applied for either of them ...."); id. at 2432 n. 10 ("[B]efore IIRIRA's effective date[,] Fernandez-Vargas never availed himself of [these forms of discretionary relief] or took action that enhanced their significance to him in particular, as St. Cyr did in making his quid pro quo agreement."). In the absence of sufficient objective evidence to assure categorical reliance — as in St. Cyr — and without an individualized showing to support Fernandez-Vargas's claimed reliance, the Supreme Court would not surmise such reliance; to do so would not be reasonable.
 
 B. The Instant Case
 
 54
 The precedential evolution from St. Cyr, to Rankine, to Restrepo, through to Fernandez-Vargas, makes clear that the continued availability of § 212(c) relief depends on the reliance of those now seeking the benefit of that relief. In particular, through the framework of Landgraf, that reliance must be reasonable.
 
 
 55
 Under this precedent, our choice between a categorical approach to reliance or an individualized approach to reliance depends upon the general likelihood that aliens of a particular class altered their conduct in reasonable reliance on the continued availability of the relief at issue. Accordingly, if the record contained sufficient objective evidence that aliens who engaged in a course of action like Wilson's "almost certainly" relied reasonably on the continued availability of § 212(c) relief, then perhaps a categorical approach similar to St. Cyr would be warranted. There is no record evidence to support such widespread reliance. Moreover, simply because Wilson could have filed an affirmative § 212(c) application does not mean he ever intended to do so. Nevertheless, Restrepo requires us to recognize the potential validity of Wilson's individualized reliance argument. See 369 F.3d at 634 (a "[p]etitioner might well decide to forgo the immediate filing of a[n affirmative § ] 212(c) application" so as to "file a stronger application for [§] 212(c) relief at a later time").
 
 
 56
 The relevant question is whether the record demonstrates that Wilson reasonably relied on the continued availability of § 212(c) relief and, based on that reasonable reliance, intentionally forwent filing an application for § 212(c) relief until a later date in the hopes of presenting a stronger application. Merely knowing of the continued availability of § 212(c) relief is not the equivalent to affirmative reliance in its continued availability. There needs to be an individualized showing to ensure us that an application of IIRIRA that forestalls § 212(c) relief is impermissibly retroactive. Therefore, in order to benefit from the argument he makes, namely, that Wilson delayed filing an affirmative § 212(c) application to build a stronger case warranting the granting of that relief, believing such relief will continue to be available, we now hold that Wilson, and other petitioners making the same argument, must make an individualized showing of reliance. Accordingly, we grant Wilson's petition and remand his case to the BIA for further remand to determine whether Wilson can make the requisite individualized showing of reliance.
 
 
 57
 III. DISCUSSION Regarding Wilson's Attempt to Seek Naturalization
 
 
 58
 In his cross-appeal, Wilson argues that the IJ's decision not to terminate his removal proceedings so that he could apply for naturalization, because the INS had not indicated that Wilson was prima facie eligible for such relief, was incorrect because the IJ could have made that determination on his own, and that the BIA's precedent decision interpreting the regulations governing termination — which fully supports the IJ's ruling — should have been revisited in light of subsequent amendments to the INA. The Government counters that the Court lacks jurisdiction to consider this issue because Wilson did not raise it before the BIA and, therefore, has failed to exhaust his administrative remedies.
 
 
 59
 However, in Zhong v. U.S. Dep't of Justice, 461 F.3d 101 (2d Cir.2006), we stated that issue exhaustion is not jurisdictional, and is therefore subject to waiver if the Government does not assert the lack of exhaustion as a defense. In the event that the defense is waived, Zhong states that it is then a matter of discretion whether this Court will consider the issue. Zhong is in some conflict with Foster v. INS, 376 F.3d 75 (2d Cir.2004), but, in any event, the Government noted the lack of exhaustion here, so Zhong would be of no assistance to Wilson.
 
 IV. CONCLUSION
 
 60
 Wilson's immigration habeas corpus is converted into a petition for review; this Court shall retain jurisdiction and venue over the petition; the petition is GRANTED, and the case is REMANDED to the BIA for further remand to determine whether Wilson can make an individualized showing of reliance on the continued availability of § 212(c) relief.
 
 
 61
 Invoking our doctrine of issue exhaustion, Wilson's cross-appeal is DISMISSED for failure to raise his naturalization eligibility argument to the BIA.
 
 
 
 Notes:
 
 
 *
 Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted Attorney General Alberto Gonzales for former Attorney General Janet Reno as the respondent in this case
 
 
 [1]
 The date of Wilson's departure for Jamaica is not found in the record
 
 
 [2]
 Petitioner claims that this transfer occurred "[a]t some point between December 22, 1997, and December 29, 1997."
 
 
 [3]
 Since the district court's judgment, Wilson has been moved to another detention facility located in Gadsen, Alabama
 
 
 [4]
 Similarly, in stating, "[i]t is not unreasonable to attribute knowledge of the availability of relief to a legal resident because it is a common requirement that defense counsel and the court advise a criminal defendant of the immigration consequences of a guilty plea," this Court's panel majority also relied uponMagana-Pizano, 200 F.3d 603, as well as ABA Standards for Criminal Justice, Pleas of Guilty, Standard 14-3.2, commentary at 75 (2d ed.1982); National Legal Aid and Defender Association Performance Guidelines for Criminal Defense Representation, Guideline 6.2(a)(3) and commentary (1994); 3 Bender's Criminal Defense Techniques (1999) § 60A.01 and § 60A.2[2]; and Pottinger v. Reno, 51 F.Supp.2d 349, 363 (E.D.N.Y.1999). See St. Cyr, 229 F.3d at 419.
 
 
 [5]
 The Court observed that because an alien's "proof of rehabilitation," the "nature, recency and seriousness" of his criminal record, and his "community ties,"inter alia, were relevant factors in determining whether he was deserving of § 212(c) relief, it was "conceivable" that an alien "convicted of a deportable crime might choose to wait to apply for [§] 212(c) relief, but would only do so if [he] believed that [§] 212(c) relief would remain available later." Id. at 634; cf. id. at 639 n. 19.